UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

PRUDENTIAL INSURANCE
COMPANY OF AMERICA,

                                Plaintiff,

        -against-                                        1:16-CV-0297 (LEK/DJS)

KRISTOFER J. GOVEL, *et al.*,

                                Defendants.
_____

## MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

        Plaintiff Prudential Insurance Company of America commenced this interpleader action

against defendants Kristofer J. Govel and Joseph A. Rogers, seeking, among other things, an

order determining the rightful beneficiary of a life insurance policy it issued to Colleen M.

Rogers as part of her employer's group life insurance plan. Dkt. No. 1 ("Complaint"). Joseph

answered and filed a cross-claim against Govel, who Joseph claims is not the proper beneficiary

of the insurance policy. Dkt. No. 10 ("Rogers Answer"). Govel then filed his own answer to the

Complaint asserting that he is entitled to the proceeds of Colleen's life insurance policy. Dkt. No.

15 ("Govel Answer"). Govel later filed a separate answer to Joseph's cross-claim, asserting again

that he, not Joseph, is the proper beneficiary of Colleen's policy. Dkt. No. 47 ("Second Govel

Answer"). Presently before the Court are Joseph's motion for summary judgment, Dkt. No. 48

("Rogers Motion"); see also Dkt. No. 48-9 ("Rogers Memorandum"); Dkt. No. 48-1 ("Rogers

Statement of Material Facts"), and Govel's cross-motion for summary judgment, Dkt. No. 60

("Govel Motion"); see also Dkt. No. 71 ("Govel Memorandum); Dkt. No. 71-1 ("Govel

Statement of Material Facts"). For the following reasons, Joseph's and Govel's motions are denied.

## II.    BACKGROUND

### A.  Factual Background

On the night of September 30, 2014, Colleen and Govel, her fiancé, were entertaining a friend at their house in Wright, New York. Rogers SMF ¶ 11; Dkt. No. 74 ("Govel Responsive SMF") ¶ 11;[1] Dkt. No. 48-5 ("Police Report") at 6. Colleen and Govel had an eight-month-old baby, C.G., who was also at the house that night. Police Report at 6. Govel was drinking throughout the evening, though he claims he consumed only two or three beers. Rogers SMF ¶ 11; Govel Responsive SMF ¶ 11. Govel decided to take Colleen for a ride on his motorcycle, and around 12:50 AM, "Govel lost control of his motorcycle while maneuvering a curve near 896 State Route 443 in . . . Wright." Rogers SMF ¶ 12; Govel Responsive SMF ¶ 12. Though the speed limit was thirty-five miles per hour, and the curve contained a sign suggesting a speed of thirty miles per hour, Govel was going approximately sixty-four to sixty-nine miles per hour as he began to lose control of the bike. Rogers SMF ¶¶ 12–13; Govel Responsive SMF ¶¶ 12–13; Police Report at 29. Also, Govel accelerated as he attempted to negotiate the curve. Rogers SMF ¶ 13; Govel Responsive SMF ¶ 13; Police Report at 27. These speed calculations were

---

[1] Govel responds to several of Rogers's statements of material fact by saying that he lacks "information or knowledge sufficient to admit or deny the truth of [the statements]." E.g., Govel Responsive SMF ¶ 15. Those responses are in fact admissions. See, e.g., Whitehurst v. 230 Fifth, Inc., 998 F. Supp. 2d 233, 248 (S.D.N.Y. 2014) (noting that a party cannot "rebut a fact submitted as undisputed by a moving party" by stating that it "'lacks[s] knowledge or information sufficient to form a belief as to' the statement in question").

"performed in a conservative manner and in accordance with professionally accepted collision reconstruction protocols." Police Report at 29.

As Govel lost control of the bike, it "fell onto its left side" and began to "slide across a grassy shoulder and lawn area." Rogers SMF ¶¶ 13–14; Govel Responsive SMF ¶¶ 13–14. "The motorcycle rotated clockwise and backward[,] then entered the parking lot of a neighboring church." Rogers SMF ¶ 14; Govel Responsive SMF ¶ 14. The motorcycle continued to slide toward a pole supporting a basketball hoop, and eventually "Colleen struck the . . . pole with sufficient force to shatter [it,] causing her severe head trauma and fatally injuring [her]." Rogers SMF ¶ 15; Govel Responsive SMF ¶ 15. After the bike hit the pole, it started to rotate counter-clockwise, "slid[ing] south until it struck the church with its tires." Rogers SMF ¶¶ 16–17; Govel Responsive SMF ¶¶ 16–17. The motorcycle finally came to a stop against the left side of the church after "slid[ing] backwards parallel with the church's foundation." Rogers SMF ¶ 17; Govel Responsive SMF ¶ 17. A post-crash investigation concluded that the crash resulted primarily from "speeding and improper acceleration on the part of . . . Govel. Intoxication by alcohol on the part of Govel was considered to be a contributing factor." Police Report at 31. The investigation ruled out "[e]nvironmental conditions, roadway defects and vehicular defects" as causes of the crash. Id.

Soon after the crash, two persons who lived nearby arrived on the scene, and one of them "smelled a strong odor of alcohol[] . . . emanating from Govel." Rogers SMF ¶¶ 19, 21; Govel Responsive SMF ¶¶ 19, 21. The local fire chief arrived after the two individuals called 911, and he too smelled alcohol on Govel's breath. Rogers SMF ¶¶ 20–21; Govel Responsive SMF ¶¶ 20–21. One of the two New York state troopers who later arrived on the scene also reported

smelling alcohol on Govel's breath. Rogers SMF ¶ 22; Govel Responsive SMF ¶ 22. Govel refused to take a breathalyzer test after the crash, though he admitted to one of the state troopers that he had had a couple of beers. Rogers SMF ¶ 22; Govel Responsive SMF ¶ 22. Govel was taken to Albany Medical Center and treated for his injuries, which included lacerations and road rash. Rogers SMF ¶ 26; Govel Responsive SMF ¶ 26. Govel refused to provide blood samples at the hospital after he received "his DWI warning and [was] advised he was under arrest for DWI." Rogers SMF ¶ 27; Govel Responsive SMF ¶ 27. About three hours after the crash, the state troopers told him they were in the process of obtaining a court order that would require him to provide blood samples, at which point he finally agreed to give blood. Rogers SMF ¶¶ 27–28; Govel Responsive SMF ¶¶ 27–28. The samples showed that, three hours after the crash, Govel had a blood alcohol content of .09 to .11. Rogers SMF ¶ 29; Govel Responsive SMF ¶ 29.

Govel was eventually charged with driving while intoxicated and second-degree vehicular manslaughter. Rogers SMF ¶ 30; Govel Responsive SMF ¶ 30. On September 2, 2015, he pleaded guilty to those charges. Rogers SMF ¶ 31; Govel Responsive SMF ¶ 31. During his plea allocution, Govel admitted that he was intoxicated while he was driving the motorcycle, that he operated the bike in a way that led to Colleen's death, and that he did that on account of his intoxication. Dkt. No. 48-6 ("Plea Allocution") at 23:24–24:11. Govel was sentenced to six months' imprisonment followed by five years of probation. Id. at 36:2–37:1.

As part of her employment with the State Employee Federal Credit Union, Colleen had a life insurance policy governed by the Employee Retirement Investment Security Act ("ERISA"). Rogers SMF ¶ 35; Govel Responsive SMF ¶ 35. The proceeds for the policy amounted to $154,000. Rogers SMF ¶ 35; Govel Responsive SMF ¶ 35. Around July 27, 2012, Colleen

named Govel as her primary beneficiary under the policy and her brother Joseph as the secondary beneficiary. Rogers SMF ¶ 36; Govel Responsive SMF ¶ 36. After Colleen died, Prudential, which had issued the policy, received a claim. Rogers SMF ¶ 37; Govel Responsive SMF ¶ 37. When Prudential learned that Govel, the primary beneficiary, had been convicted of second-degree vehicular manslaughter in connection with Colleen's death, it determined that further investigation was required to ascertain the proper beneficiary, and it eventually filed this interpleader action to resolve "the rights of the beneficiaries under the policy and New York State law." Rogers SMF ¶ 38; Govel Responsive SMF ¶ 38.

It appears that Govel had the support of Colleen's family during sentencing; several members of her family wrote letters of support for him. Govel SMF ¶ 10. Things are different now, however. Allen J. Rogers, Joseph's and Colleen's father and C.G.'s grandfather, does not want Govel to receive the proceeds of Colleen's life insurance policy. Dkt. No. 70-2 ("Allen Rogers Affidavit") ¶ 4. Allen says that he initially wanted Govel to stay out of prison for the sake of C.G., but that after Govel got out, he "significantly limited any contact" between C.G. and Colleen's side of the family. Id. ¶ 7. Allen suggests that Govel wants the money so that he can pay off the mortgage on his house, which "has no lasting benefit for C.G. as she does not own the house." Id. ¶ 8. According to Allen, Joseph should receive Colleen's life insurance proceeds instead because he "intends to place the insurance proceeds, after paying for the cost of the present litigation, into a [t]rust for the sole benefit of C.G." Id. ¶ 9.

Govel continues to have the support of Bernadine Payton, Colleen's and Joseph's mother and C.G.'s grandmother. Dkt. No. 71-3 ("Payton Affidavit") ¶¶ 4, 6–7, 9–10. Payton claims that Colleen "designated [Govel] as the primary beneficiary to ensure that [Govel] would be able to

provide a home for . . . C.G." Id. ¶ 15. Joseph points out that this is unlikely, since C.G. was born

in 2014, but the beneficiary form designating Govel was executed on July 27, 2012. Dkt. No. 74

("Rogers Responsive Statement of Material Facts") ¶ 3. In any event, Payton argues that "Colleen

would want the life insurance benefits to go to [Govel] in order to provide their daughter the

lifestyle that she and [Govel] began together." Payton Aff. ¶ 14.

### B. Procedural History

 On March 11, 2016, Prudential filed its interpleader Complaint. Compl. It stated that it

was "ready, willing and able" to pay out Colleen's life insurance proceeds, but because of its

uncertainty about whether Govel or Joseph was the proper beneficiary, it requested that the Court

"determine to whom [the] benefits should be paid." Id. ¶ 14–17. Prudential later deposited

$154,000, representing the life insurance proceeds, with the Court, after which it was dismissed

from this case. Dkt. No. 35 ("September Order"). Joseph filed an answer and cross-claim against

Govel, asserting that under New York's slayer rule, which forbids "a life insurance beneficiary

who kills the insured . . . from collecting the insured's life insurance proceeds," John Hancock

Life Ins. Co. v. Perchikov, No. 04-CV-98, 2010 WL 185007, at *2 (E.D.N.Y. Jan. 15, 2010),

Govel had forfeited his right to receive the proceeds, Rogers Answer ¶¶ 14–16. Govel filed his

first answer about one week later, but he did not respond to Joseph's cross-claim, instead stating

simply that he "is not prohibited from the proceeds of the policy due to the 'Slayer Rule.'" Govel

Answer ¶ 5. About six months later, having obtained new counsel, Dkt. No. 25, Govel filed an

answer to Joseph's cross-claim, asserting again that he is the proper beneficiary of Colleen's life

insurance policy and that the slayer rule does not apply to this case. Second Govel Answer

¶¶ 3–4.

On November 23, 2016, Joseph moved for summary judgment, arguing that New York's slayer rule prohibits Govel from receiving Colleen's life insurance proceeds because he pleaded guilty to second-degree vehicular manslaughter. Rogers Mem. at 9–10. Joseph also argues that, regardless of the crime of which Govel was convicted, his actions on the night of the crash show that he recklessly caused Colleen's death, which disqualifies him from receiving the life insurance proceeds under the slayer rule. Id. at 10–11. On February 3, 2017, Govel cross-moved for summary judgment, arguing, among other things, that it would be improper for this Court to hold that the slayer rules applies to every conviction for second-degree vehicular manslaughter, and that in any case, Govel did not recklessly cause Colleen's death. Govel Mem. at 8, 11.[2]

## III. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party claims will

---

[2] Govel's Memorandum lacks page numbers, so the Court uses those generated by the Court's electronic filing system ("ECF").

demonstrate the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party carries the ultimate burden of proof and has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Id.</u> at 322.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000); <u>Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.</u>, 164 F.3d 736, 742 (2d Cir. 1998). Thus, a court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." <u>Gallo v. Prudential Residential Servs., Ltd. P'ship</u>, 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV.    DISCUSSION

### A.  The Slayer Rule

Under New York law,[3] "one cannot take property by inheritance or will from an ancestor or benefactor whom he has murdered." Riggs v. Palmer, 22 N.E. 188, 190 (N.Y. 1889). New York's slayer rule applies to life insurance proceeds, so that "[a] beneficiary of a life insurance policy forfeits his or her right to the proceeds if . . . she murders or feloniously causes the death of the insured." Ganelina v. Pub. Adm'r, N.Y. Cty., 963 N.Y.S.2d 545, 550 (Sup. Ct. 2013); accord, e.g., In re Loud's Estate, 334 N.Y.S.2d 969, 970 (Sup. Ct. 1972) ("[T]he law [regarding the slayer rule] is the same whether we consider the right to inherit or the right to collect the proceeds of the insurance. Public policy in this state denies benefits in both instances."). The slayer rule rests on the belief that a wrongdoer should not "profit from the death of [her] victim." In re Estates of Covert, 717 N.Y.S.2d 392, 394 (App. Div. 2000). The rule is not limited to murder; indeed, courts have applied it to cases involving both first- and second-degree manslaughter. JJG-1994, 2011 WL 3737277, at *3 (collecting cases); see also In re Rivera, No. 2006-2296/A, 2015 WL 1637765, at *3 (N.Y. Sur. Ct. Mar. 31, 2015) ("The [slayer] rule . . . is generally applied in cases where one intentionally murders another person or causes

_____

[3]  Although Prudential stated in its Complaint that this Court's jurisdiction was premised on the fact that Colleen's life insurance policy was governed by ERISA, Compl. ¶ 5, ERISA does not preempt application of New York's slayer rule here, see Union Sec. Life Ins. Co. of N.Y. v. JJG-1994, No. 10-CV-369, 2011 WL 3737277, at *2 (N.D.N.Y. Aug. 24, 2011) (Kahn, J.) (noting that, while the plaintiff had "filed this claim in federal district court because the life insurance policy at issue [was] regulated by ERISA," that statute did not preempt New York's slayer rule). Further, "[t]he parties' briefs assume that New York law controls, and such 'implied consent . . . is sufficient to establish choice of law.'" Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (second alteration in original) (quoting Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989)).

the death of another person by some felonious or other intentional or reckless criminal conduct."); In re Timpano, No. 2008-344, 2013 WL 4779560, at *8 (N.Y. Sur. Ct. Aug. 30, 2013) (noting that, while the slayer rule has been applied to persons who "recklessly cause[] . . . death," it does not apply to criminally negligent homicide).[4]

The wrongdoer need not be convicted of a crime in order to forfeit her right to collect under a life insurance policy belonging to the victim. In re Karp, No. 2005-3737, 2011 WL 5027174, at *3 (N.Y. Sur. Ct. Sept. 22, 2011); accord 38 N.Y. Jur. 2d Decedents' Estates § 104 (2d ed. 2017) ("[A] conviction for any form of homicide is not essential to preclude one who kills from inheriting property left by his or her victim."). "Absent a conviction, however, there can be no forfeiture unless it is proven [by a preponderance of the evidence] that a person acted recklessly or intentionally in causing the victim's death, not that the person acted negligently." In re Karp, 2011 WL 5027174, at *3. Further, even if the wrongdoer was "convicted of a crime which did not constitute a forfeiture [under the slayer rule]," forfeiture may still be appropriate if the conduct underlying the conviction in fact falls under the slayer rule. In re Wells, 350 N.Y.S.2d 114, 117 (Sur. Ct. 1973). For example, in In re Timpano, the respondent had pleaded guilty to criminally negligent homicide, which does not require a showing of recklessness and which therefore does not automatically lead to forfeiture. 2013 WL 4779560, at *8. Yet the court

---

[4] A person commits first-degree manslaughter by, among other possibilities, causing someone's death "with intent to cause serious physical injury [to that person]." N.Y. Penal Law § 125.20(1). A person commits second-degree manslaughter by, among other possibilities, "recklessly caus[ing] the death of another person." Id. § 125.15(1). And "a person acts with criminal negligence with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation." Id. § 15.05(4).

reviewed the facts of the case and determined that the slayer rule barred the respondent from inheriting from the decedent because his "reckless conduct caused [the decedent's] death." Id. at *10.

## B. The Slayer Rule and Second-Degree Vehicular Manslaughter

Govel pleaded guilty to second-degree vehicular manslaughter. Plea Allocution at 25:10–16. A person commits second-degree vehicular manslaughter if she "causes the death of another person" and "operates a motor vehicle in violation of [various subsections of New York Vehicle and Traffic Law section 1192 criminalizing driving while intoxicated or impaired by drugs,] . . . and as a result of such intoxication or impairment by the use of a drug . . . operates such motor vehicle . . . in a manner that causes the death of such other person." N.Y. Penal Law § 125.12(1). Before the New York state legislature amended the statute in 2005, a conviction for second-degree vehicular manslaughter required proof of "criminal negligence." People v. Stickler, 948 N.Y.S.2d 696, 699 (App. Div. 2012). The 2005 amendments "eliminat[ed] th[is] heavy prosecutorial burden" in an attempt to "strengthen the deterrent effect of the . . . statute[]." Id. The result is that there is no longer "any form of mens rea [required by] the vehicular manslaughter statutes, and . . . prosecutors [need] to prove only (1) that the defendant was intoxicated [or impaired], and (2) that a death occurred." Ryan J. Mahoney, Note, Depraved Indifference Murder in the Context of DWI Homicides in New York, 82 St. John's L. Rev. 1537, 1579 (2008). If a prosecutor proves those two elements, a rebuttable presumption arises that the defendant's intoxication or impairment caused her to operate her motor vehicle in a way that led to the death of another person. N.Y. Penal Law § 125.12; accord People v. Baker, 826 N.Y.S.2d 550, 551 (Essex Cty. Ct. 2006).

Joseph argues that the slayer rule necessarily applies to anyone convicted of second-degree vehicular manslaughter. Rogers Mem. at 9. He concedes that the "current statute (in effect at the time of Colleen's death) does not contain a requisite mental state." Id. But he suggests that the legislature's decision to remove the requirement of proving criminal negligence shows that it views "the unintentional killing of another as a result of driving while intoxicated [as] transcend[ing] mere criminal negligence." Id. at 9–10. That is a questionable inference. Joseph has provided no evidence that in the legislature's view, causing someone's death while operating a motor vehicle in an intoxicated or impaired condition is reckless per se. What is clear is that the legislature wanted to increase "the deterrent effect" of the statutes dealing with deaths caused by intoxicated or impaired driving. Stickler, 948 N.Y.S.2d at 855. By removing any mens rea requirement, the amendments make it easier for prosecutors to obtain convictions for second-degree vehicular manslaughter, which could increase the likelihood of punishment for someone who kills another person by operating a vehicle in an intoxicated or impaired state. That, in turn, may have the effect of enhancing the statute's ability to deter intoxicated or impaired driving. See Tom R. Tyler, Legitimacy and Criminal Justice: The Benefits of Self-Regulation, 7 Ohio St. J. Crim. L. 307, 308 (2007) ("Risk calculations are potentially shaped by both the anticipated likelihood of punishment and by judgments about its severity. Of the two, research consistently suggests that it is the likelihood of punishment that is particularly important in shaping behavior . . . ."). At best, this shows that the legislature considered driving while intoxicated or impaired to be a serious offense that needed to be combated more effectively. But the Court cannot infer from the 2005 amendments that the legislature believed that every conviction for second-degree vehicular manslaughter necessarily involves a reckless defendant.

Joseph's argument is flawed in another respect: the legislature's intentions in enacting the 2005 amendments are beside the point. Under both the pre-amendment and current versions of second-degree vehicular manslaughter, a person may be guilty of that crime even if she is only criminally negligent, and New York's slayer rule does not apply to criminally negligent homicides. See In re Timpano, 2013 WL 4779560, at *8 ("Forfeiture does not arise if the party was convicted of or found to have committed . . . Criminally Negligent Homicide."). For example, in People v. Roth, 683 N.Y.S.2d 358, 359 (App. Div. 1998), the defendant was convicted of, among other things, second-degree vehicular manslaughter and second-degree manslaughter. Second-degree manslaughter requires proof that the defendant recklessly caused someone else's death. N.Y. Penal Law § 125.15(1). The court found that while the evidence was "legally sufficient to establish that [the] defendant acted with criminal negligence," there was not enough evidence to establish recklessness. Roth, 683 N.Y.S.2d at 359. Nevertheless, the court upheld the defendant's conviction for second-degree vehicular manslaughter, which at the time required a showing of criminal negligence. Id. Roth shows that even under the pre-amendment version of the statute, a person could be guilty of second-degree vehicular manslaughter without being reckless. The Court therefore cannot hold that a conviction for second-degree vehicular manslaughter necessarily prohibits someone from receiving the life insurance proceeds of her victim.[5]

---

[5] Roth also shows that Joseph is mistaken in asserting that "drunkenness is synonymous with recklessness under New York State law and policy." Dkt. No. 56 ("Rogers Reply") at 2. The Roth defendant's ability to operate his vehicle "was impaired by the effects of alcohol and marihuana," but the court reversed his conviction for second-degree manslaughter on the ground that there was insufficient evidence of recklessness. 683 N.Y.S.2d at 359.

## C. The Slayer Rule and Govel's Conduct the Night of the Accident

That does not end the inquiry, however. If a reasonable jury must find by a preponderance of the evidence that Govel recklessly caused Colleen's death, the Court would have to grant summary judgment for Joseph, and Govel would forfeit his right to receive the life insurance proceeds. In re Karp, 2011 WL 5027174, at *3. The Court recognizes that "the evidence in this case is 'right on the knife's edge of either granting [summary judgment in favor of Joseph] or allowing [the case] to go to the jury.'" Ahmed v. Astoria Bank, No. 16-1389, 2017 WL 1906726, at *1 (2d Cir. May 9, 2017) (second alteration in original). But because a reasonable jury could go either way as to whether Govel recklessly caused Colleen's death, the Court must deny both parties' summary judgment motions.

Under New York law,

> [a] person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts recklessly with respect thereto.

N.Y. Penal Law § 15.05(3). As noted above, second-degree manslaughter requires the prosecution to prove that the defendant recklessly caused the death of another person. Id. § 125.15(1). In other words, the defendant "must engage in conduct that creates a substantial and unjustifiable risk that [death] will occur." People v. Atkinson, 799 N.Y.S.2d 125, 129 (App. Div. 2005), aff'd as modified, 853 N.E.2d 227 (N.Y. 2006). "The reckless perpetrator is aware of the risk but consciously disregards it and engages in the conduct anyhow, thereby deviating grossly

from the standard of conduct that a reasonable person would observe in the situation." Id. Further, "a person is deemed to act recklessly, not only when he or she is aware of and consciously disregards certain specified risks, but also when he or she fails to perceive or be aware of such risks by reason of voluntary intoxication." 35 N.Y. Jur. 2d Criminal Law: Principals and Offenses § 40 (2d ed. 2017); accord, e.g., People v. Valencia, 932 N.E.2d 871, 872 (N.Y. 2010) (Graffeo, J., concurring) ("[I]t is . . . well settled that voluntary intoxication does not excuse a reckless state of mind."); People v. Heier, 935 N.Y.S.2d 208, 211 (App. Div. 2011) ("Because [the defendant] was unaware of the risk solely due to his voluntary intoxication, he acted recklessly when he caused [his victim] serious physical injury."); Bernard E. Gegan, More Cases of Depraved Mind Murder: The Problem of Mens Rea, 64 St. John's L. Rev. 429, 431 (1990) ("[O]ne accused of manslaughter in the second degree, in which the mens rea is simply recklessness, cannot escape conviction merely because intoxication clouded his otherwise clear perception of the risk. Drunken negligence is equated with sober recklessness as a matter of statutory policy.").

It is undisputed that Govel, with Colleen as his passenger, was driving his motorcycle at approximately twice the speed limit as he negotiated the curve where the bike fell. Rogers SMF ¶¶ 12–13; Govel Responsive SMF ¶¶ 12–13. There is also no dispute that Govel accelerated as he entered the curve, and that the accident took place at night. Rogers SMF ¶¶ 12–13; Govel Responsive SMF ¶¶ 12–13. The post-crash investigation revealed that Govel's decision to accelerate was "improper" and contributed to the crash. Police Report at 31. While Govel now claims that he had only two or three beers the night of the crash, Govel Responsive SMF ¶ 11, he admitted during his plea allocution that he was intoxicated when the crash took place and that his

intoxicated caused him to operate his motorcycle in a way that led to Colleen's death, Plea Allocution at 23:24–24:11. Because Govel admitted these two facts "during his plea allocution, [he] is precluded by the doctrine of collateral estoppel from relitigating th[em] in the instant civil action." Buggie v. Cutler, 636 N.Y.S.2d 357, 359 (App. Div. 1995); accord, e.g., JJG-1994, 2011 WL 3737277, at *3.

A reasonable jury presented with these facts could certainly conclude that Govel "create[d] a substantial and unjustifiable risk that [death] w[ould] occur." Atkinson, 799 N.Y.S.2d at 129. Drunkenly driving a motorcycle at night at approximately twice the speed limit poses a significant risk that a crash will take place. That risk was increased by Govel's decision to accelerate as he negotiated the curve, which was one of the causes of the crash. Police Report at 31. A reasonable jury could also find that such a crash would create a serious risk of either the driver or the passenger dying. And Govel's conduct the night of the crash could plausibly be found to "reflect 'the kind of seriously blameworthy carelessness whose seriousness would be apparent to anyone who shares the community's general sense of right and wrong.'" People v. Briskin, 3 N.Y.S.3d 200, 206 (App. Div. 2015) (quoting People v. Asaro, 988 N.E.2d 810, 814 (N.Y. 2013)). Although there is no direct evidence of Govel's subjective awareness of the risk he created, "objective evidence of the surrounding circumstances may be weighed in making the factual determination [of whether a defendant acted recklessly]," People v. Licitra, 393 N.E.2d 456, 464 (N.Y. 1979), and a reasonable jury could infer that Govel must have known his conduct—becoming intoxicated, taking his fiancée for a ride on his motorcycle at night, going about twice the speed limit, improperly accelerating on a curve—was a gross deviation from what a reasonable person would have done in the situation. Finally, even if a reasonable jury

16

believed that Govel was not aware of the risk he created due to his admitted intoxication, that would not negate his recklessness, because "the conscious disregard of such [a] risk encompasses the risk created by a defendant's voluntary intoxication." People v. Gray, 736 N.Y.S.2d 856, 859 (Sup. Ct. 2002); see also People v. Schaffer, 436 N.Y.S.2d 749, 752 (App. Div. 1981) ("[T]he jury could quite rationally have believed that the defendant was either aware of the risk she had created or unaware of it solely by reason of impairment of her judgment due to the consumption of alcohol.").

Indeed, New York state courts have routinely found similar conduct to be sufficient evidence of recklessness in the context of second-degree manslaughter convictions. See, e.g., People v. Reichel, 975 N.Y.S.2d 470, 478 (App. Div. 2013) (finding evidence of recklessness where the defendant, having drunk heavily throughout the day, "drove 76 miles per hour through a residential neighborhood having a posted speed limit of 30 miles per hour, at night, [and] lost control of the vehicle"); People v. De Long, 704 N.Y.S.2d 408, 409 (App. Div. 2000) (holding that the evidence was sufficient to infer reckless conduct where the defendant "was driving erratically at an excessive rate of speed on a two-lane suburban road in a highly intoxicated condition"). These cases support the conclusion that a reasonable jury *could* find that Govel recklessly caused Colleen's death. Nevertheless, the Court cannot conclude that a reasonable jury *must* find that Govel committed second-degree manslaughter.

First, "courts are [generally] reluctant to decide issues of intent on a motion for summary judgment." Vumbaca v. Terminal One Grp. Ass'n L.P., 859 F. Supp. 2d 343, 380 (E.D.N.Y. 2012) (collecting cases); see also 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2730 (4th ed. 2017) ("Inasmuch as a determination of someone's state of mind

usually entails the drawing of factual inferences as to which reasonable people might differ—a function traditionally left to the jury—summary judgment often will be an inappropriate means of resolving an issue of this character."). Further, under New York law, the question "whether [a defendant] possessed a 'reckless' mens rea[] [is a] question[] of fact properly left to the trier of fact," People v. Felder, 579 N.Y.S.2d 247, 249 (App. Div. 1991), and New York's highest court has recognized that "criminal recklessness and criminal negligence with respect to a particular result . . . may in a particular case, if not hypothetically or definitionally, be but shades apart on the scale of criminal culpability," People v. Stanfield, 330 N.E.2d 75, 77 (N.Y. 1975), abrogated on other grounds by People v. Glover, 439 N.E.2d 376, 377 (N.Y. 1982). The Court is thus disposed to err on the side of caution in determining whether the issue of Govel's recklessness can be decided at the summary judgment stage.

Turning to the facts of this case, a reasonable jury could conclude that there is not enough evidence of Govel's subjective awareness of the risk he created the night of Colleen's death to deem him reckless. New York state courts are particularly likely to uphold second-degree manslaughter convictions where the defendants were engaged in risky behavior not only in the moments leading up to the accident, but also before the events immediately preceding the crash. See, e.g., People v. Heinsohn, 462 N.E.2d 145, 145 (N.Y. 1984) (finding recklessness where the defendant "was traveling well above the speed limit in an unregistered vehicle while tailgating a van when he suddenly pulled out to the left, crossed the center line and drove onto the safety island where he struck and killed two pedestrians"); People v. Wolz, 752 N.Y.S.2d 382, 383–84 (App. Div. 2002) (upholding a second-degree manslaughter conviction where the "defendant was driving at an excessive rate of speed, weaving in and around other vehicles, and drove onto the

shoulder of the road before losing control of his car and crossing the median into the opposing lane of traffic where his vehicle spun around and stopped, causing the death of one motorcyclist and serious injuries to another"); People v. Jones, 604 N.Y.S.2d 145, 146 (App. Div. 1993) (finding that the defendant engaged in reckless conduct because he "drove a stolen car approximately 69 miles per hour in a 30 miles per hour zone, passed a red light, and drove onto the sidewalk during rush hour in a heavily populated area, to avoid being caught by the police . . . [and] then swerved to avoid hitting another car and drove onto the sidewalk a second time"); People v. Rossi, 558 N.Y.S.2d 698, 663 (App. Div. 1990) (rejecting the "defendant's claim that the element of recklessness was not supported by legally sufficient evidence" where the defendant "admitted taking drugs before and during driving and knew that his driving was erratic before the accident"); People v. Verdile, 500 N.Y.S.2d 846, 849 (App. Div. 1986) (finding recklessness where a witness "described defendant's vehicle as 'all over the road' and testified that other cars were pulling off the road to avoid a collision only minutes before the accident occurred"); People v. Van Dusen, 453 N.Y.S.2d 272, 272–73 (App. Div. 1982) (upholding a second-degree manslaughter conviction where the defendant "was traveling at an excessive rate of speed, particularly in view of the driving conditions, and . . . was tailgating and passing cars in a dangerous manner with two cars having to veer off the highway to avoid a collision with defendant's vehicle approaching from the opposite direction"); Scahffer, 436 N.Y.S.2d at 866–67 (affirming a second-degree manslaughter conviction where the defendant "testified that she passed several cars going in the opposite direction, that the center median was on the right, and that when she stopped at the last intersection before the crash, two cars faced her, one directly in front of her").

On the other hand, "[t]he absence of a pattern of prior dangerous conduct may militate against a finding of recklessness." 6 Richard A. Greenberg et al., <u>New York Practice, Criminal Law</u> § 6:22 (4th ed. 2016). For example, in <u>Roth</u>, the defendant took his girlfriend for a ride on his ATV while he was intoxicated, and he admitted that at the time of the accident that killed his girlfriend, he was driving "too fast" "on a downhill curved portion of a dirt roadway." 683 N.Y.S.2d at 359. But partly because there was "no evidence that [the] defendant drove the ATV erratically or unreasonably approximately two or three hours earlier that day when he drove with his girlfriend as a passenger," the Court held that the evidence was insufficient to find that the defendant recklessly caused his girlfriend's death. <u>Id.</u>

The relevance of a defendant's conduct before the moment of the fatal crash is clear: if a defendant was engaging in highly risky behavior for some period of time before the moments leading up to the accident, it is reasonable to infer that she had some awareness of the riskiness of her conduct at the moment of the crash. <u>Cf.</u> Richard A. Greenberg et al., <u>supra</u>, § 6:10 ("In [some] situations, there may be some specific warning that can reasonably be seen as alerting the defendant to the risk, and therefore establishing his awareness and conscious disregard of it.").[6] But if there is no evidence that the defendant was engaging in dangerous behavior before the events immediately preceding the accident, a jury might well conclude that the crash was caused by a momentary lapse of judgment rather than the defendant's conscious disregard of a risk.

Here, the parties have not pointed to any evidence that Govel exhibited a "pattern [of risky driving] prior to the fatal accident." <u>Id.</u> § 6:22. Govel was clearly going too fast when he

---

[6] Of course, a jury might instead conclude that a defendant's willingness to drive dangerously for an extended period of time before the accident shows a *lack* of awareness of the risks she created. But that is not the inference drawn by the <u>Roth</u> court.

entered the curve in which the crash occurred, but there is no evidence in the record of how he was handling the motorcycle before he began to negotiate the curve. That could lead a reasonable jury to conclude that Govel was simply criminally negligent rather than reckless in attempting to negotiate the curve at a high speed. Consider as well that in finding evidence of recklessness, New York state courts often rely on concrete evidence that the defendants knew about a risk or received clear warnings about their risky behavior. See, e.g., People v. Brown, 994 N.Y.S.2d 344, 345 (App. Div. 2014) ("[The d]efendant drove a van with knowledge of its extremely defective steering mechanism, . . . he drove it after consuming a large amount of alcohol and becoming highly intoxicated, and . . . after he lost control of the van due to its faulty steering he accelerated rather than braking as the van went onto a busy sidewalk."); People v. Peryea, 889 N.Y.S.2d 741, 743–44 (App. Div. 2009) ("Defendant completed a seven-week long drinking and driving educational program in November 2004, less than 18 months before th[e] fatal accident."); People v. Sands, 552 N.Y.S.2d 756, 757 (App. Div. 1990) (finding recklessness where the defendant was "warned several times of an upcoming stop sign, . . . specifically acknowledged his speed and stated that there was insufficient time to stop"). The record is devoid of evidence suggesting that Govel received similar kinds of pre-crash warnings about the dangerousness of his conduct.

A reasonable jury would also not be compelled to find that the only reason Govel did not perceive the riskiness of his conduct was his voluntary intoxication. As noted above, "[a] person who creates . . . a risk but is unaware thereof solely by reason of voluntary intoxication also acts recklessly with respect thereto." N.Y. Penal Law § 15.05(3). Again, Govel admitted that he was intoxicated and that his intoxication contributed to the crash. Plea Allocution at 23:24–24:11. But

these admissions do not conclusively establish that he failed to recognize the dangerousness of his behavior solely because of his intoxication. Perhaps Govel was drunk enough that his ability to operate the motorcycle was impaired, but not so drunk that his intoxication prevented him from perceiving the risks entailed by his conduct. See Richard A. Greenberg et al., supra, § 6:22 ("[R]eckless manslaughter is typically found when *extreme* intoxication appears to be the sole reason the defendant did not perceive the obvious dangerousness of his conduct." (emphasis added)). Of course, in order to decide that Govel was not reckless, a jury would also have to find that he did not perceive the risks he created, but, for the reasons just articulated, that finding would not be unreasonable on these facts. Thus, since a reasonable jury would be entitled to go either way as to whether Govel recklessly caused Colleen's death, the Court denies both parties' motions for summary judgment.

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Rogers's motion for summary judgment (Dkt. No. 48) is **DENIED**; and it is further

**ORDERED**, that Govel's cross-motion for summary judgment (Dkt. No. 60) is **DENIED**; and it is further

**ORDERED**, that U.S. Magistrate Judge Daniel J. Stewart shall schedule and preside over a settlement conference between the parties; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      June 06, 2017
              Albany, New York

Lawrence E. Kahn
U.S. District Judge